UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


NATHANIEL MAURICE HATCHETT,

              Plaintiff,                                Civil Action No.
                                                    08-CV-11864

vs.

                                                    HON. BERNARD A. FRIEDMAN

CITY OF DETROIT,
KENNETH WILLIAMS,
HILTON NAPOLEON,
CITY OF STERLING HEIGHTS,
MICHAEL REECE,
SCOTT LUCAS,
RICHARD VAN SICE,
JEFFREY PLAUNT,
COUNTY OF MACOMB,
CARL MARLINGA and
ERIC KAISER,

              Defendants.

_____/


**OPINION AND ORDER GRANTING THE MOTIONS OF DEFENDANTS
CITY OF STERLING HEIGHTS, REECE, LUCAS, VAN SICE, PLAUNT,
COUNTY OF MACOMB, MARLINGA and KAISER FOR SUMMARY JUDGMENT**


           This matter is presently before the court on (1) the motion of defendants City of

Sterling Heights, Reece, Lucas, Van Sice and Plaunt for summary judgment [docket entry 47]; (2)

the motion of defendant Kaiser for summary judgment [docket entry 64]; and (3) the motion of

defendants County of Macomb and Marlinga for summary judgment [docket entry 44]. The motions

have been fully briefed and are ripe for decision.

*Background*

   This is a case of "wrongful conviction." In March 1998 plaintiff Nathaniel Hatchett was convicted following a bench trial in Macomb County Circuit Court of carjacking, armed robbery, kidnapping and first degree criminal sexual conduct. He was sentenced to 25 to 40 years in prison. In 2008, after having been incarcerated for over eleven years, Hatchett was released due to the efforts of the Innocence Project at the Thomas M. Cooley Law School. Lawyers at the Innocence Project learned that a DNA test (discussed below), conducted before trial at the prosecutor's request, was not disclosed to the defense. Based in part on the discovery of that DNA test, the Innocence Project persuaded the current Macomb County prosecutor to dismiss the charges against Hatchett and stipulate to his release.

   The crimes of which Hatchett was convicted were committed on November 12, 1996, in Sterling Heights, Michigan. The victim, Annett Ventimiglia, finished her shift as a K-Mart cashier at about midnight. As she was getting into her car, she was accosted by a young man who threatened to shoot her if she did not slide onto the passenger seat. She complied. The assailant drove the car onto a side street and raped Ventimiglia. After threatening to kill her and her family if she reported the incident, the rapist let Ventimiglia out and he drove off with her car. Ventimiglia immediately called the police and was taken to a hospital, where semen was collected from her vagina and underwear. Three days later, a Detroit police officer, defendant Kenneth Williams, spotted Hatchett and four passengers driving Ventimiglia's car in Detroit. Hatchett was arrested and questioned by Williams and then turned over to Sterling Heights police officers, defendants Richard Van Sice and Jeffrey Plaunt. After several hours of questioning, Hatchett confessed to the crime.

   In June 1997, several months before trial, the Michigan State Police crime lab issued

a DNA report that concluded the semen collected from Ventimiglia did not belong to Hatchett. This report was disclosed to defense counsel and the court and is not an issue in the present case. In mid-August 1997 the prosecutor, defendant Eric Kaiser, met with Van Sice and the victim. According to Kaiser's affidavit, at this meeting "it was discussed . . . whether the victim's husband would voluntarily provide a blood sample to determine if his DNA matched the donor of the semen found on the victim's vaginal swab and panties." Kaiser Aff. ¶ 11. The husband's blood sample was sent to the Michigan State Police crime lab for testing. This test, which excluded Ventimiglia's husband as the semen donor, was completed on September 11, 1997. Plaintiff alleges that while both Kaiser and Van Sice received a copy of the report containing these test results, neither plaintiff nor his criminal defense attorney was ever informed of the test or its results.

This DNA test, while not directly exculpatory, nonetheless gained significant importance at Hatchett's trial. Despite knowing the husband was excluded as the semen donor, Kaiser stated during his closing argument that it was unimportant that Hatchett's DNA test results excluded him as the donor because the victim "was only fairly certain that the Defendant ejaculated at all. We're not allowed to speculate or under the rules or statute question the victim as to any other possibilities here. We really can't speculate whether another person, *her husband*, the Lone Ranger created any vaginal deposits that were eventually tested. . . ." Trial Tr. 250-51 (Macomb County Defs.' Mot. for Summ. J., Ex. 2) (emphasis added). In commenting on the DNA test that excluded Hatchett as the semen donor, the trial judge indicated this "certainly presents a possible doubt," but he found it to be outweighed by the other evidence, including Hatchett's confession and the victim's identification of him as the rapist. The judge downplayed the significance of the DNA test "given the multiple explanations that may present for the test results received on this examination" [sic] (Tr.

280). He did not elaborate as to the "multiple explanations." In affirming the conviction, the Michigan Court of Appeals subscribed to Kaiser's theory, which was repeated on appeal by another assistant Macomb County prosecutor, that the semen collected from the victim may have come from her husband:

> Defendant additionally contends that his innocence was established by the results of a DNA analysis performed on semen found in the victim's vagina and underpants. However, although DNA analysis of the two identifiable genetic loci on the victim's vaginal swab and four identifiable loci on her underpants established that defendant was not the donor of that material, there are several plausible explanations for these results; for example, *the donor might have been the victim's spouse*. Furthermore, the victim told the treating nurse that defendant ejaculated "on" her, and she told the treating physician that she was only "fairly certain" that defendant ejaculated at all; therefore, it is altogether possible that defendant's semen would not be found in the victim's vagina or in her underpants.

*People v. Hatchett*, 2000 WL 33419396, at *2 (Mich. Ct. App. May 19, 2000) (emphasis added). The Michigan Supreme Court denied Hatchett's delayed application for leave to appeal. *See People v. Hatchett*, 463 Mich. 920 (2000).

In March 2008, lawyers associated with The Thomas M. Cooley Law School Innocence Project filed a motion in Macomb Circuit Court on Hatchett's behalf for a new trial. One of the arguments made in support of this motion was that "the defense, the trial court, and the court of appeals were never made aware of the fact that the victim's husband was also excluded as a donor of the biological material. . . . If the court of appeals would have had knowledge of Mr. Ventimiglia's exclusion in addition to Mr. Hatchett's exclusion, the reasonable conclusion would have been that Mr. Hatchett should not have been convicted of this crime." Sterling Heights Defs.' Mot. for Summ. J., Ex. F, pp. 10-11. In his response to this motion, Macomb County prosecutor Eric Smith, who was elected to the office long after Hatchett was convicted, stated:

Significant also was the Assistant prosecutor's statement in closing "We really can't speculate whether another person, her husband, the Lone ranger created any vaginal deposits that were eventually tested." (TR pp 250-251). The record is not clear as to whether the test results excluding the victim's husband as the source of the material from the vaginal swab and the swabs from the clothing of the victim information [sic] was turned over to the defense counsel before trial. Nonetheless, no mention of the husband's exclusion was made by either side, not commented on by the judge.

*    *    *

The People have extensively reviewed the evidence in this case. Conclusions from this review are that it appears, under any reasonable circumstance, that the donor of the biological material is the perpetrator. Although significant time has passed since the original investigation, it further appears that appropriate methods of collection and preservation were utilized so as to ensure as much as possible the validity of the results. Further, that the original court, in its analysis of the DNA evidence at trial, was not presented with the exclusion of the husband at trial. Thus the People cannot reasonably oppose defendant's motion for a new trial. . . .

Pl.'s Resp. to the Macomb County Defs.' Mot. for Summ. J., Ex. 1, pp. 3-4. In April 2008, the Macomb County Circuit Court granted Hatchett's motion, dismissed the charges, and ordered him to be released.

Plaintiff commenced the instant lawsuit in May 2008. He bases this case primarily on two alleged instances of misconduct. First plaintiff alleges that Kaiser and Van Sice deliberately withheld the results of the DNA test of the victim's husband, thereby violating his due process rights. Second he alleges that his confession was coerced by the two Sterling Heights police officers, Van Sice and Plaunt. Hatchett also alleges that these officers, as well as the Detroit police officer, Williams, told him specific details about the abduction and rape so that, after being interrogated for hours by Van Sice and Plaunt, he was able to make a believable, albeit false,

"confession" because he knew specific details that were known only to the victim, the perpetrator, and the interrogating police officers. Hatchett claims he initially denied being the perpetrator, but that after several hours of interrogation, first in Detroit and then in Sterling Heights, he eventually succumbed. In this connection it is noteworthy that Hatchett was a 17-year-old high school student at the time with an

IQ of only 74. The confession was an important part of the prosecutor's case. In explaining his verdict, the trial judge stated that the confession was "of overwhelming importance" (Tr. 277). And the "strikingly detailed confession" was one of the reasons mentioned by the court of appeals in support of its conclusion that the conviction was based on sufficient evidence. *People v. Hatchett*, 2000 WL 33419396, at *1.

The defendants in this matter fall into four groups. The "City of Detroit defendants" are the City of Detroit, Detroit police officer Williams, and Detroit police lieutenant Hilton Napoleon, who allegedly "supervised, trained, and directed . . . Williams[] in the handling of the . . . investigation and prosecution." Am. Comp. ¶ 15. The "Sterling Heights defendants" are the City of Sterling Heights, Sterling Heights police officers Van Sice and Plaunt, and Sterling Heights police sergeants Michael Reece and Scott Lucas, who allegedly "supervised, trained, and directed . . . Van Sice and Plaunt[] in the handling of Mr. Hatchett's investigation and prosecution." *Id.* ¶ 18. The "Macomb County defendants" are Macomb County and Carl Marlinga, who allegedly "supervised, trained, and directed the assistant prosecuting attorneys in the handling of Mr. Hatchett's investigation and prosecution [and] was an official policymaker for Defendant Macomb County." *Id.* ¶ 20. While Kaiser was an assistant Macomb County prosecutor at time relevant to this case, he is no longer employed by Macomb County and is represented separately.

The amended complaint ("AC") asserts the following 15 claims:

Count I alleges that defendants Van Sice, Plaunt and Williams violated Hatchett's Fourteenth Amendment due process rights by fabricating his confession (by feeding him details of the crime and coercing him to confess falsely) and by using the confession to convince the prosecutor's office to prosecute. The AC also frames this as a *Brady* violation on the theory that defendants had a duty to disclose that the confession was false and coerced. This count also includes the claim that Van Sice violated plaintiff's *Brady* rights by failing to disclose the victim's husband's DNA test results.

Count II alleges that defendant Kaiser violated Hatchett's Fourteenth Amendment due process rights by failing to disclose – to Hatchett's counsel or the court – the results of the victim's husband's DNA test, which the AC alleges was *Brady* material. The AC further alleges that Kaiser "destroyed" this evidence by failing to include it in the prosecutor's case file, thereby preventing the report from being discovered by the assistant prosecutor who handled the appeal. The AC alleges, alternatively, that if Kaiser did not know of these test results, then he violated plaintiff's rights by failing to inquire about the test results after the husband gave a blood sample for testing.

Count III alleges that defendants Van Sice, Plaunt and Williams violated plaintiff's Fourth and Fourteenth Amendment rights by causing him to be arrested without probable cause, as these defendants knew his confession was coerced and fabricated. Hatchett also alleges that at the preliminary examination Van Sice and Williams testified falsely that he had confessed.

Count IV alleges that defendants Van Sice, Plaunt and Williams violated Hatchett's Fifth and Fourteenth Amendment rights to be free from self-incrimination and "coercive police

conduct."

Count V, entitled "supervisory liability," alleges that defendant Napoleon was present during Williams' interrogation of Hatchett at Detroit police headquarters; and that defendants Reece and Lucas were present when Van Sice and Plaunt interrogated Hatchett, first at Detroit police headquarters and subsequently at the Sterling Heights police station. Napoleon, Reece and Lucas allegedly were deliberately indifferent in their supervision, training, and discipline of these officers. Defendant Marlinga and Macomb County allegedly "failed to train, supervise, and discipline the assistant prosecutors in the proper and constitutional investigation and prosecution of criminal defendants . . . about the receipt, tracking, and disclosure of exculpatory information." Am. Comp. ¶ 279.

Counts VI and VII assert *Monell* claims of municipal liability against the City of Detroit and the City of Sterling Heights, respectively, based on their alleged "practice and custom of coercing witness[es] and suspects into false confessions; failing to investigate crimes adequately, fabricating evidence in investigations, and failing to disclose exculpatory and impeachment evidence." *Id.* ¶¶ 284, 294.

Count VIII asserts a *Monell* claim of municipal liability against Macomb County based on its alleged "practice and custom regarding inadequate tracking, filing, sharing, and disclosure of exculpatory information." *Id.* ¶ 303. This count also faults Marlinga for failing to train the prosecutors in these areas. *See id.* ¶¶ 304-309.

Count IX alleges that defendants Van Sice, Plaunt and Williams conspired to deprive Hatchett of his constitutional rights by supplying him with details and coercing his confession.

Count X alleges that all defendants violated Hatchett's rights under Article 1, Section

17 of the Michigan Constitution by interfering with his right to "fair and just treatment in an investigation and prosecution."  *Id.* ¶ 320.

Counts XI, XII, XIII, XIV and XV assert common law tort claims against Van Sice, Plaunt and Williams for false arrest/false imprisonment, malicious prosecution, intentional infliction of emotional distress, abuse of process and gross negligence.

***Sterling Heights Defendants' Motion for Summary Judgment***

As noted above, the claims against the Sterling Heights defendants are, in short, that (1) Plaunt and Van Sice violated Hatchett's due process rights by supplying him with details of the crime and coercing his confession, (2) Van Sice violated Hatchett's due process rights by concealing the fact that a DNA test excluded the victim's husband as the semen donor, (3) Van Sice violated Hatchett's due process rights by testifying falsely at the preliminary examination (by stating that Hatchett had confessed), and (4)  Reece, Lucas, and Sterling Heights failed to train and supervise Plaunt and Van Sice.  Therefore, most of the claims against these defendants are based on the allegation that Hatchett's confession was coerced.  The only other claim is the claim that Van Sice concealed the DNA test.

The Sterling Heights defendants argue that most of plaintiff's claims fail because he is collaterally estopped from relitigating the trial judge's finding that his confession was free and voluntary.  The trial judge held a *Walker* hearing[1] in September 1997, at which he heard testimony

_____

[1] A *Walker* hearing is conducted in accordance with *People v. Walker*, 374 Mich. 331 (1965), which requires trial courts, not juries, to determine the voluntariness of confessions.  At such a hearing,

the defendant may take the stand and testify for the limited purpose

from defendants Williams and Van Sice.[2]  Hatchett's attorney cross-examined both witnesses

extensively.  The judge also listened to an audio recording of the confession.  Hatchett declined to

testify, although the judge explained to him that anything he said could not be used against him at

trial.  At the conclusion of the hearing the judge found "that the statements elicited from the

Defendant were elicited as voluntary statements considering the totality of the circumstances. . . .

[I]t's clear that Detective Van Sice was very careful to make sure that the Defendant was responding

knowledgeably to the questions posed. . . .  [T]he Defendant was indeed understanding and

voluntarily waiving his Miranda associated rights in providing the statements, so the Court will deny

the motion to suppress" (Tr. 63-65).  Hatchett did not appeal this ruling.

Hatchett concedes that the trial judge held a *Walker* hearing and found the confession

_____

of making of record his version of the facts and circumstances under
which the confession was obtained. We hold further that by so doing
defendant does not waive his right to decline to take the stand on trial
in chief, if retrial is ordered. Neither does he waive any of the other
rights stemming from his choice not to testify.

*Id.* at 338.

[2] A copy of the *Walker* hearing transcript is attached as Exhibit N to the Sterling Heights
defendants' supplement brief.  At the beginning of the hearing, the trial judge identified the
following defense claims as being the ones at issue:

The Defendant alleges, basically, in paragraph 5 of their motion that
they have basic, specific claims that violate Walker and Miranda.
They are: The Detective falsely informing the Defendant if he
cooperated and tell the officers what they wanted he would be
released.  Officers failed to believe the Defendant's initial statement
that he wasn't involved and continued to question the Defendant until
he said what they demanded, and finally the arresting officers
provided the Defendant with a specificity of facts sufficient to give
him the ability to then detail and outline the crime.

(Tr. 1-2.)

to be voluntary. He also concedes that, as a general rule, if a judge finds at a *Walker* hearing that

a confession was voluntary, this finding is binding in a subsequent civil proceeding. Nonetheless,

Hatchett argues that he is not collaterally estopped from contesting the voluntariness of his

confession in this case because his "judgment of conviction was set aside and the charges dismissed

against him, therefore, the judgment is deprived of its conclusive effect . . . ." Pl.'s Br. in Opp'n to

the Sterling Heights Defs.' Mot. for Summ. J. at 13.[3]

The parties agree that there is no Michigan case law directly addressing the specific

issue in the present case, namely, whether the voluntariness of a confession can be relitigated in a

subsequent civil action if a finding of voluntariness was made at a *Walker* hearing in a criminal

matter in which the charges have been dismissed. However, the parties do agree with the following

general statement of Michigan law on collateral estoppel:

> For collateral estoppel to apply, a question of fact essential to the
> judgment must have been actually litigated and determined by a valid
> and final judgment. In addition, the same parties must have had a full
> opportunity to litigate the issue, and there must be mutuality of
> estoppel.

---

[3] This statement is not entirely correct. More precisely, Hatchett filed a motion with the
trial court for a new trial pursuant to Mich. Comp. Laws § 770.16, a Michigan statute that
provides a procedure for "testing of biological material identified during the investigation
leading to [an incarcerated defendant's] conviction, and for a new trial based on the results of
that testing." Section 770.16(1). The prosecutor stipulated to retest the body fluids taken from
the victim and the blood donated by the victim's husband, and the same DNA results were
obtained as before. In his response to Hatchett's motion, the prosecutor indicated he "cannot
reasonably oppose defendant's motion for a new trial" and "move[d] that the charges in this case
be dismissed." People's Answer to Defendant's Motion for New Trial, attached as Exhibit A to
Pl.'s Br. in Opp'n to Dft. Kaiser's Mot. for Summ. J. The "hearing disposition" dated April 14,
2008, does not indicate that a ruling on Hatchett's motion was made. *See id.* Ex. B. This
document does state: "People's motion to dismiss charges granted." *Id.* Nothing in the record
suggests that the "judgment of conviction was set aside," as plaintiff asserts. Under Michigan
law this would be accomplished by filing a motion for relief from judgment pursuant to MCR
6.502.

*Storey v. Meijer, Inc.*, 431 Mich. 368, 373 n.3 (Mich. 1988). The parties also agree that the mutuality requirement does not apply where, as here, the doctrine is being asserted defensively against a party who had an opportunity to litigate the issue in the prior proceeding. *See Kloian v. Van Fossen*, 2007 WL 942195, at *4 (Mich. App. Mar. 29, 2007), *citing Monat v. State Farm Ins. Co.*, 469 Mich. 679, 680-681, 691, 694-695 (2004). Finally, the parties agree that Michigan courts, in some cases, have looked to §§ 28 and 29 of the Restatement (Second) of Judgments in deciding whether to give preclusive effect to a factual determination that was made in a prior action.[4]

---

[4] Section 28 of the Restatement states that relitigation is not precluded if

(1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or

(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or ©)

because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

Section 29 of the Restatement lists the following additional circumstances under which a party may be permitted to relitigate a previously determined issue:

(1) Treating the issue as conclusively determined would be incompatible with an applicable scheme of administering the remedies in the actions involved;

(2) The forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not available in the first action and could likely result in the issue being differently determined;

(3) The person seeking to invoke favorable preclusion, or to avoid unfavorable preclusion, could have effected joinder in the first action between himself and his present adversary;

(4) The determination relied on as preclusive was itself inconsistent with another determination of the same issue;

(5) The prior determination may have been affected by relationships among the parties to the first action that are not present in the subsequent action, or apparently was based on a compromise verdict or finding;

(6) Treating the issue as conclusively determined may complicate determination of issues in the subsequent action or prejudice the interests of another party thereto;

(7) The issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based;

(8) Other compelling circumstances make it appropriate that the party be permitted to relitigate the issue.

It appears that the only exceptions listed in §§ 28 and 29 which might apply in the present case are the general catch-alls, such as § 28(2) ("to avoid inequitable administration of the laws"); § 28(3) ("differences in the quality or extensiveness of the procedures followed in the two courts," i.e., plaintiff has full discovery in the present case); § 29(2) ("the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue"); and § 29(8) ("other compelling circumstances"). Plaintiff argues he did not have a "full and fair opportunity" to litigate the voluntariness issue at the *Walker* hearing because Williams, Van Sice and Plaunt supplied him with details of the crime, coerced his confession, and testified falsely at the *Walker* hearing, and also because Van Sice and Kaiser failed to disclose the victim's husband's DNA test. The court disagrees. Plaintiff clearly had the opportunity at the *Walker* hearing, where he was represented by counsel, to call witnesses, cross-examine the prosecutor's witnesses, and to testify on his own behalf. He elected to do nothing but cross-examine the prosecutor's witnesses. Plaintiff also could have appealed the trial judge's finding on voluntariness, as part of his appeal from the judgment, but again he elected not to do so and allowed this finding to go unchallenged. Further, since the undisclosed DNA test of the victim's husband had nothing to do with the voluntariness of the confession, even if the results of that test had been made available to Hatchett prior to the *Walker* hearing, it could not have assisted him in addressing the question of the voluntariness of his confession. Therefore, the court finds that none of the exceptions listed in §§ 28-29 of the Restatement applies.

It is clear enough that factual findings made at a *Walker* hearing are considered to

be final determinations on the merits. *See, e.g., People v. Gray*, 393 Mich. 1, 4 (1974) ("the determination of involuntariness at a Walker hearing [is] a factual determination. . . . [I]t should be binding on the People for all purposes under the doctrine of collateral estoppel. We see no good purpose to be served by re-litigating the question of voluntariness when that matter has been fully and fairly presented to competent authority for determination"); *People v. Mann*, 89 Mich. App. 511 (1979) (stating, based on *Gray*, that a finding of voluntariness at a *Walker* hearing in one criminal case collaterally estopped defendant from relitigating the issue in a second, related criminal case). *See also Hirmuz v. City of Madison Heights*, 469 F. Supp.2d 466, 478 (E.D. Mich. 2007) (citing *Mann* for the proposition that "[i]n Michigan, collateral estoppel applies to bar relitigation of claims raised and determined at a *Walker* hearing when the criminal defendant is convicted").

    While the case authority on the point is scant, the court is persuaded that the rule from *Mann* and *Gray* applies even when the validity of the criminal judgment is later called into question. In *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds by Frantz v. Village of Bradford* , 245 F.3d 869, 874 (6th Cir. 2001), the Sixth Circuit stated:

> There is an additional reason for holding that plaintiff had no cause of action under § 1983 for malicious prosecution. Plaintiff contested the issue of probable cause at his preliminary hearing. Since an accused has the right to call witnesses and cross-examine witnesses produced by the State, a preliminary hearing is an adversary proceeding under Michigan law. *People v. Johnson*, 8 Mich.App. 462, 466, 154 N.W.2d 671 (1967). In this case plaintiff also contested the finding of probable cause in state circuit court after the examining judge bound him over. Under these circumstances we believe he is collaterally estopped from raising the issue of probable cause in his § 1983 claim for malicious prosecution. Where a party has had a "full and fair opportunity" to litigate an issue in earlier state proceedings, he is precluded from relitigating the same issue in a later federal case. *Allen v. McCurry*, 449 U.S. 90, 94-96, 103-04, 101 S.Ct. 411, 414-15, 419, 66 L.Ed.2d 308 (1980). . . .

We do not hold that every determination in a preliminary hearing should be given preclusive effect in a subsequent § 1983 action. Some preliminary hearings are little more than formalities. Also, even when an opportunity for full adversary proceedings is afforded, strategic concerns may counsel against engaging in such an exercise at the early stages of a criminal proceeding. However, where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.

Significantly, the plaintiff in *Coogan* prevailed in the criminal case because the court dismissed the charges on a speedy trial violation. This is important because the probable cause finding was accorded collateral estoppel effect in the subsequent § 1983 action even though, just as in the present case, the criminal charges had been dismissed. The same reasoning supports the conclusion that a finding of voluntariness at a *Walker* hearing is binding in a subsequent civil action even if the criminal charges have been dismissed in the interim. In both cases the finding was made in a separate judicial proceeding where the defendant-turned-plaintiff had a full and fair opportunity to litigate the issue in question and, indeed, took full advantage of that opportunity.

In support of his position that he should not be bound by the trial judge's finding of voluntariness, plaintiff cites two Sixth Circuit cases, *Gregory Const. Co. v. Blanchard*, 879 F.2d 864 (6th Cir. 1989) (unpublished), and *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir.1985), both for the statement that the "general rule is that a judgment which is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel." *Gregory Const. Co.* was a public contracting case involving issues having nothing to do with those in the present case, but *Dodrill* is analogous. In *Dodrill*, plaintiff was charged with possession of marijuana. A jury convicted, despite Dodrill's defense that the police officer lied and planted the marijuana in his car. On appeal, the conviction was vacated on the grounds that the case had been prosecuted under an

unconstitutional local ordinance. Dodrill then brought a § 1983 action against the officer. The district court granted summary judgment for the officer on the grounds that the alleged Fourth Amendment violation had been litigated during the criminal case and decided by the jury in the officer's favor. The Sixth Circuit reversed:

> We have found no Ohio law on this specific point, but the general rule is that a judgment which is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel. . . .
>
> Any other rule would needlessly and astronomically proliferate the number of issues raised on appeal. If a judgment could be entirely vacated yet preclusive effect still given to issues determined at trial but not specifically appealed, appellants generally would feel compelled to appeal every contrary factual determination. Such inefficiency neither lawyers nor judges ought to court. Litigants ought to be encouraged to expend their energies on their most compelling issues and arguments, without paranoia about the preclusive effect of other issues or determinations.
>
> Dodrill's appeal from his conviction was based solely on constitutional grounds because he believed that issue presented the best opportunity for reversal. By this course of action he was not acquiescing in adverse factual determinations made at his trial. When he won his appeal and the judgment was vacated, all such factual determinations were vacated with it, and their preclusive effect surrendered.

*Id.* at 444-45. The court finds *Dodrill* to be inapplicable. In addition to dealing with Ohio law, not Michigan law, the factual issues in *Dodrill* (i.e., whether the police officer lied and planted evidence) were resolved within the jury's general verdict, whereas in the present case the discreet issue of voluntariness was resolved in a separate, adversarial judicial proceeding, where Hatchett had a full and fair opportunity to offer evidence, testify, and cross-examine the government's witnesses.

In sum, the court concludes that plaintiff is collaterally estopped from relitigating the voluntariness of his confession because this issue was conclusively resolved against him at his

*Walker* hearing. This conclusion is supported by the Michigan Supreme Court's decision in *People v. Gray*, 393 Mich. 1, 4 (1974), and the Sixth Circuit's decision in *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987). Further, none of the exceptions to this rule outlined in §§ 28-29 of the Restatement on Judgments applies. Plaintiff had a full and fair opportunity to litigate the voluntariness issue at the *Walker* hearing. He elected not to testify. Nor did he appeal the finding of voluntariness, although he did appeal (unsuccessfully) on grounds of insufficiency of the evidence. And although the charges against Hatchett were eventually dismissed, the reason this was done had nothing to do with the voluntariness of his confession being questioned.

Plaintiff's other claims against the Sterling Heights defendants are that Van Sice concealed the results of the DNA test of the victim's husband, that the supervisors (Reece and Lucas) failed to train and supervise Van Sice, and that the city failed to have a proper training and supervision policy, all in violation of plaintiff's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

The Sixth Circuit recently held that a police officer can be held liable under § 1983 for violating a person's *Brady* rights by withholding exculpatory evidence from the prosecutor. *See Moldowan v. City of Warren*, 578 F.3d 351, 378-81 (6th Cir. 2009). The difficulty with plaintiff's claim in the present case is that he successfully argued in his motion for a new trial, filed with Macomb Circuit Court in March 2008, that the prosecutor, Eric Kaiser, received the victim's husband's DNA test results from the crime lab scientist, Kathy Kuebler, on September 11, 1997, shortly before the *Walker* hearing. *See* Sterling Heights Defs.' Ex. F. Likewise, in the present case, in response to admissions request No. 66 from the Sterling Heights defendants, plaintiff admitted "that, prior to [Hatchett's] trial, Defendant Kaiser was informed of the DNA evidence which

established the fact that [the victim's] then-husband was not the source of any biological material found on her after the crimes were committed against her." *See* Sterling Heights Defs.' Ex.G.

Plaintiff has painted himself into a corner with these admissions. He argued in state court, and has admitted in the present case, that the prosecutor had the victim's husband's DNA test results, both before the *Walker* hearing and before trial, but did not disclose them to the defense. Therefore, if a *Brady* violation occurred, it was caused by Kaiser's failure to disclose the test results to the defense, not by Van Sice's failure to disclose the test results to Kaiser. Under *Moldowan*, plaintiff could sue Van Sice for a *Brady* violation only if Van Sice hid the test results from Kaiser and, as a result, Kaiser did not know about them and therefore failed to disclose them to the defense. But plaintiff has admitted this is not the case. In other words, even assuming that Van Sice concealed the test results, he could not have violated *Brady* because Kaiser, as plaintiff has admitted, had already received those test results from another source, namely, Kuebler.

For these reasons, the court concludes that (1) plaintiff's confession was not coerced because the voluntariness of the confession was conclusively determined by the trial judge at the *Walker* hearing and may not be relitigated here, and (2) Van Sice did not violate plaintiff's *Brady* rights by concealing the results of the DNA test of the victim's husband because plaintiff has admitted that the prosecutor possessed that evidence from another source. Since all of plaintiff's claims against the Sterling Heights defendants flow from these two alleged violations, and since both of them fail as a matter of law, defendants Van Sice, Plaunt, Reece, Lucas, and the City of Sterling Heights are entitled to summary judgment.

***Defendant Kaiser's Motion for Summary Judgment***

Plaintiff's claims against defendant Kaiser are that he had the victim's husband's DNA tested, failed to disclose the test results to Hatchett's defense counsel, and then "destroyed" the test results by not placing them in his file, which made them unavailable to the assistant prosecutor who handled the appeal. The "destruction" of this evidence was significant because on appeal the prosecutor repeated the argument made by Kaiser at trial, namely, that Hatchett's exclusion as the donor of the semen found on the victim was irrelevant, since perhaps the semen belonged to the husband. As noted above, the Michigan Court of Appeals accepted this argument in explaining why Hatchett's negative DNA test did not exonerate him.

While the allegations against Kaiser are disturbing, to say the least, a review of Supreme Court and Sixth Circuit cases on the subject leads the court to believe that he is protected by prosecutorial immunity.

The leading Supreme Court case is *Imbler v. Pachtman*, 424 U.S. 409 (1976). In that case, Imbler was convicted of murder. After serving several years in prison, he was released on a federal habeas writ. Imbler then brought a § 1983 action against the police officers and the prosecutor (Pachtman). Imbler alleged that at trial Pachtman had knowingly used false testimony, suppressed exculpatory fingerprint evidence, and introduced an artist's sketch of the perpetrator which Pachtman knew had been altered after the fact in order to more closely resemble Imbler. Although these allegations of misconduct were egregious, the Supreme Court unanimously held that Pachtman was entitled to absolute prosecutorial immunity:

> If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution. . . . The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could

be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

*Id.* at 424-25. The Court indicated that other remedies, but not money damages, are available as a check and balance on unethical prosecutors:

The ultimate fairness of the operation of the system itself could be weakened by subjecting prosecutors to § 1983 liability. Various post-trial procedures are available to determine whether an accused has received a fair trial. These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

*Id.* at 427. The Court also stated that the key to determining whether a prosecutor is entitled to absolute immunity is whether he was engaged in a function "intimately associated with" the judicial process. The Court distinguished between "investigative" activities and those associated with the prosecutor's role as the state's advocate:

The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those cases, in its Circuit and in some others, which hold that a prosecutor engaged in certain investigative activities enjoys, not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's. We agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.

> We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.

*Id.* at 430-31.  Since all of Pachtman's alleged actions took place at trial, or in preparation for trial, they were deemed to be prosecutorial/judicial in nature and therefore covered by absolute immunity.

Subsequent cases have continued to recognize the distinction between "investigative" or "evidence gathering" actions of a prosecutor and those more closely connected with prosecuting a case.  In *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), Buckley was charged with murder.  When the jury could not reach a verdict, a mistrial was declared.  Eventually the charges were dropped.  Buckley then sued the prosecutor, Fitzsimmons, on the grounds that before trial he had fabricated evidence and held a press conference falsely accusing Buckley of the crime.  The Court held that absolute immunity did not apply.  The Court again focused on the distinction between "investigative" and "judicial" acts of the prosecutor:

> . . . We expressly stated [in *Imbler*] that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and are nonetheless entitled to absolute immunity. *Id.*, at 431, n. 33, 96 S.Ct., at 995, n. 33. . . . To be sure, *Burns* made explicit the point we had reserved in *Imbler*, 424 U.S., at 430-431, and n. 33, 96 S.Ct., at 994-996, and n. 33: A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. *See Burns*, 500 U.S., at 494-496, 111 S.Ct., at 1943-1944. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. . . .
>
> . . . When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Hampton v. Chicago*, 484 F.2d

> 602, 608 (CA7 1973) (internal quotation marks omitted), cert. denied, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974). Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." 484 F.2d, at 608-609.

*Id.* at 272-74. The Court then held that Fitzsimmons' investigatory work was not entitled to absolute immunity because it was done as part of the effort to establish probable cause (i.e., before charges were brought) and that his statements to the press were not covered because "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Id.* at 277.

More recently, in *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009), the Court summarized the law on prosecutorial immunity as follows:

> The Court made clear [in *Imbler*] that absolute immunity may not apply when a prosecutor is not acting as "an officer of the court," but is instead engaged in other tasks, say, investigative or administrative tasks. To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of the "functional" considerations discussed above. In *Imbler*, the Court concluded that the "reasons for absolute immunity appl[ied] with full force" to the conduct at issue because it was "intimately associated with the judicial phase of the criminal process." The fact that one constitutional duty at issue was a positive duty (the duty to supply "information relevant to the defense") rather than a negative duty (the duty not to "use ... perjured testimony") made no difference. . . .

> * * *

> In the years since *Imbler*, we have held that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application. We have held that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support

of a warrant application.

(Citations omitted.)

The Sixth Circuit also follows the "functional approach" in deciding whether a prosecutor is entitled to absolute immunity. For example, in *Cady v. Arenac County*, 574 F.3d 334 (6th Cir. 2009), plaintiff alleged that a county prosecutor violated his constitutional rights by conditioning a plea on plaintiff's agreement not to bring a civil action against the people who plaintiff was charged with assaulting. While the condition was questionable, and perhaps a First Amendment violation, the Sixth Circuit dismissed the complaint on grounds of absolute immunity:

> "[P]rosecutors are absolutely immune from liability under § 1983 for their conduct ... insofar as that conduct is intimately associated with the judicial phase of the criminal process." "Since the [Supreme] Court's decision in *Imbler*, courts have taken a functional approach to absolute immunity." "The analytical key to prosecutorial immunity ... is advocacy-whether the actions in question are those of an advocate." "If the challenged actions of the prosecutor were not performed in his role as advocate, if they do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, then only qualified immunity applies."

> But courts will bar § 1983 suits arising out of even unquestionably illegal or improper conduct by the prosecutor so long as the general nature of the action in question is part of the normal duties of a prosecutor. *Imbler*, 424 U.S. at 413, 430, 96 S.Ct. 984 (holding that a prosecutor accused of knowingly presenting false testimony at trial is protected by absolute immunity); *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir.1986) (holding that a prosecutor's alleged "use of perjured testimony [,] the non-disclosure of exculpatory information[,] ... conflict of interest problems [,] and ... spy allegations" are all "related to the acts of an advocate and thus come within the area of prosecutorial immunity"); *Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir.1978) (holding that a prosecutor is absolutely immune from a suit claiming that he destroyed and falsified evidence).

*Id.* at 340 (some citations omitted).

Similarly strong statements concerning the reach of prosecutorial immunity were made in *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir. 1997), in which plaintiff alleged that an assistant prosecutor brought false criminal charges against her. Finding that absolute immunity barred this claim, the court stated:

> Thus, as the doctrine has emerged, absolute prosecutorial immunity protects only those acts falling within a prosecutor's role as advocate for the state and intimately associated with the judicial process, and not for administrative or investigative acts antecedent or extraneous to the judicial process. Investigative acts undertaken in direct preparation of judicial proceedings, including the professional evaluation of evidence, warrant absolute immunity, whereas other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection. . . .

> This circuit has had previous occasion to consider whether absolute immunity should extend to a prosecutor's decision to file a criminal complaint and seek an arrest warrant. The complaint in *Joseph v. Patterson*, 795 F.2d 549 (6th Cir. 1986), alleged that Oakland County prosecutors and investigators employed by the prosecutor's office . . . entered into concerted action with the police to bring false criminal charges against the Josephs and used coerced false statements to obtain arrest warrants, search warrants, and signatures on complaint forms from a state Circuit Court. As in the case against Ireland, all criminal charges against the Josephs were dismissed upon preliminary examination in the district court. Relying upon *Imbler*, the Joseph panel held that the prosecutors were protected by absolute immunity for "knowingly obtain[ing] issuance of criminal complaints and arrest warrants against the Josephs based on false, coerced statements." "The decision to file a criminal complaint and seek issuance of an arrest warrant are quasi-judicial duties involved in 'initiating a prosecution.'" As such, they are protected under *Imbler*, for "securing the person of the defendant is part of initiating a prosecution and should be insulated." *See also Grant v. Hollenbach*, 870 F.2d 1135, 1139 (6th Cir.1989) (holding prosecutor absolutely immune from suit for deciding to investigate and conspiring to present false charges to the grand jury).

\*   \*   \*

> . . . Absolute prosecutorial immunity will likewise attach to
> administrative or investigative acts necessary for a prosecutor to
> initiate or maintain the criminal prosecution.

*Id.* at 1445-46, 1447 (footnotes and some citations omitted).

As this summary of the case law clearly shows, absolute prosecutorial immunity covers all actions taken by a prosecutor while acting as an "advocate" for the state. While plaintiff argues that some of Kaiser's actions were more administrative/investigative in nature, the cases indicate that even actions with that label are protected so long as they were undertaken in direct connection with, or in preparation for, a judicial proceeding. Even "unquestionably illegal or improper conduct [is protected] so long as the general nature of the action in question is part of the normal duties of a prosecutor." *Cady*, 574 F.3d at 340.

The main allegation of prosecutorial misconduct in this case is that Kaiser failed to disclose the DNA test excluding the victim's husband as the semen donor and then argued to the trial judge that perhaps the husband was the donor and therefore Hatchett was not exonerated by the fact that his DNA was not found on the victim. As reprehensible as this was, Kaiser was clearly acting as the state's advocate in deciding what evidence to disclose and what arguments to make at trial. *Imbler* flatly held that a prosecutor is absolutely immune for actions taken "in presenting the State's case." 424 U.S. at 431. And the Sixth Circuit in *Cady* noted with approval its earlier holding that a claim alleging "the non-disclosure of exculpatory information" is barred by prosecutorial immunity. 574 F.3d at 340, *quoting Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986). By arranging for the victim's husband to be tested, plaintiff argues that Kaiser was acting more as a police officer in search of clues. However, the Sixth Circuit in *Ireland* held that investigative acts are covered by the immunity if done "to initiate or maintain the criminal prosecution." 113 F.3d at

1447. The test at issue was done to maintain the prosecution, since Hatchett's guilt had been called into question once his DNA test excluded him as the semen donor.

        The only remaining thread of plaintiff's claim against Kaiser is that he "destroyed" the DNA test by not placing it in his file, thereby preventing anyone else from finding it. This added allegation does not save the claim. In *Cady* the Sixth Circuit held that immunity attaches "so long as the general nature of the action in question is part of the normal duties of a prosecutor." 574 F.3d at 340. Further, *Cady* cited with approval a Seventh Circuit case, *Heidelberg v. Hammer*, 577 F.2d 429 (7th Cir. 1978), that extended absolute immunity to a prosecutor who allegedly "destroyed and falsified evidence." *Cady*, 574 F.3d at 340. Certainly if a prosecutor has immunity for destroying evidence, he must also have immunity for failing to place evidence in his file. Evaluating and filing evidence is part of a prosecutor's "normal duties" associated with his role as the state's advocate.

        For these reasons, the court concludes that Kaiser is entitled to summary judgment. Under the state of the law as summarized above, immunity protects Kaiser because all of the alleged misconduct was committed while he was acting as the state's advocate. In this role, the prosecutor is absolutely immune from claims that he fabricated or used or destroyed evidence, that he failed to disclose *Brady* material, or that he made false or misleading arguments at trial. As the Supreme Court noted in *Imbler*, immunity protects even unethical prosecutors because it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." 424 U.S. at 428.


**Macomb County Defendants' Motion for Summary Judgment**

        The final set of defendants who are currently moving for summary judgment are Carl

Marlinga and Macomb County. Marlinga is being sued solely in his official capacity as the former county prosecutor. Therefore the suit against him is in effect no different from the suit against the county, as "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Plaintiff's claim is that the county, through Marlinga as the policy-maker for the prosecutor's office, failed to train its prosecutors in "the receipt, tracking, filing, sharing and disclosure of exculpatory information." Am. Compl., Count VIII.

Having considered the parties' arguments, the court concludes that this claim fails for three independent reasons. First, plaintiff has failed to show that a municipality has a duty to train its prosecutors in understanding and applying *Brady*. Second, even if such a duty existed, plaintiff has not shown that defendants breached it. Third, even if such a duty existed and defendants breached it, plaintiff has not shown that defendants' failure to train caused his rights to be violated.

The threshold issue is whether a municipality has *any* obligation to "train" its prosecutors. The typical "failure to train" case involves police officers. As Justice O'Connor explained in her concurring opinion in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 396-97 (1989),

> [w]here a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied. Only then can it be said that the municipality has made "'a deliberate choice to follow a course of action ... from among various alternatives.'" *Ante*, at 1205, *quoting Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).

> In my view, it could be shown that the need for training was obvious in one of two ways. First, a municipality could fail to train its employees concerning a clear constitutional duty implicated in

28

recurrent situations that a particular employee is certain to face. As the majority notes, *see ante*, at 1205, n.10, the constitutional limitations established by this Court on the use of deadly force by police officers present one such situation. The constitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue.

\*   \*   \*

Second, I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion. In such cases, the need for training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements.

The court is unaware of any binding authority extending a municipality's training duty to professionally educated and degreed employees, such as prosecutors.[5]  As Justice O'Connor indicated, a municipality's duty to train arises in two circumstances.  The first arises when (1) a clear

---

[5] The only case cited by the parties on this issue is *Thompson v. Connick*, 578 F.3d 293 (5th Cir. 2009) (*en banc*).  In that case, plaintiff was wrongfully convicted due to a prosecutor's failure to disclose a blood test that would have exonerated him.  After his release, plaintiff sued the district attorney's office, and the district attorney in his official capacity, on the theory that they failed to train their assistants in their *Brady* obligations.  There was evidence at trial that the assistants received no formal training regarding *Brady*, that they did not understand their *Brady* obligations, that office policy was to withhold "certain police reports and witness statements," and that *Brady* violations had occurred previously in several other cases.  *Id.* at 312-13.  The jury returned a verdict for plaintiff, the district court entered judgment on the verdict, and a Fifth Circuit panel affirmed.  The panel's opinion was vacated when the full court decided to hear the matter *en banc*.  Since the *en banc* court was equally divided, the end result was that the district court's judgment was affirmed without any binding appellate decision.  *See Thompson*, 578 F.3d at 295 (Jolly, J., concurring) (noting that, because "there is no majority opinion, . . . no opinion today will bind any court or future party in this circuit").  This case has no precedential value, and neither the district court's order denying defendants' motion to vacate the judgment nor the Fifth Circuit's opinions cite any cases involving "failure to train" claims against prosecutors' offices.

constitutional duty governs particular employees (e.g., police officers) who are likely to face a certain situation and be called upon to act in a certain way (e.g., using deadly force while attempting to apprehend a fleeing felon), ***and*** (2) "it is . . . clear that failure to inform [them] of that duty will create an extremely high risk that constitutional violations will ensue." *Id.* at 396. It is the second of these two requirements that is absent in the case of professionally educated employees – particularly prosecutors, who at the time they are hired presumably are already aware of their constitutional duties by virtue of the fact that they have graduated from law school and passed the bar examination. A municipality need not train prosecutors about that which they already know, including their duties under *Brady*.[6] As Judge Clement noted in her opinion in *Thompson v. Connick*, 578 F.3d 293, 304-305 (5th Cir. 2009):

> Training is what differentiates attorneys from average public employees. A public employer is entitled to assume that attorneys will abide by the standards of the profession, which include both ethical and practical requirements. Thus, prosecutors are personally responsible as professionals to know what *Brady* entails and when to perform legal research to understand the "gray areas." To hold a public employer liable for failing to train professionals in their profession is an awkward theory. By analogy, it is highly unlikely that a municipality could be held liable for failing to train a doctor it employed in diagnostic nuances.

Holding "a public employer liable for failing to train professionals in their profession" is not only an "awkward theory," but an impossible theory. If a municipality had a duty to train its prosecutors about *Brady*, the duty would have no logical end. A municipality could be

_____

[6] An exception might well exist if the municipality were aware that its prosecutors have repeatedly violated citizens' rights under *Brady*. In this event, a duty to train (or, more aptly, to retrain) could arise under the second circumstance identified by Justice O'Connor – namely, where there is a "pattern of constitutional violations." *Harris*, 489 U.S. at 397. Plaintiff does not allege the existence of any such pattern of *Brady* violations in Macomb County. Such a pattern was established in *Thompson*. *See* 578 F.3d at 312-13.

held liable for failing to train its prosecutors about their duties not to excuse jurors based on race, not to vouch for witnesses, and not to authorize warrants that are unsupported by probable cause.

Even if defendants Marlinga and Macomb County were required to train their assistant prosecutors in their duties under *Brady*, defendants have provided evidence showing that at least a minimal level of such training was provided. This disproves deliberate indifference. The Macomb County Prosecutor's Office "policy and procedures manual" (Macomb County Defs.' Ex. 8) required all assistants to abide by all ethical rules adopted by the State Bar of Michigan, including Rule 7-103, which requires prosecutors to disclose to defense counsel "evidence . . . that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." In addition, Marlinga avers in his second affidavit (Macomb County Defs.' Supp. Br., Ex. 1) that all assistants, including Kaiser, were required to attend training offered by the Prosecuting Attorney's Association of Michigan ("PAAM") and the Prosecuting Attorney's Coordinating Council ("PACC") about prosecutors' obligations, including under *Brady,* and that assistants were also required to watch 1.5 hours of PAAM video training tapes per month. Marlinga avers that his office also occasionally provided in-house training on prosecutors' duties, including under *Brady*, and that Kaiser sometime presented at these sessions. Marlinga avers that it was Kaiser's idea to use a *Brady* question during interviews with applicants to the prosecutor's office, and that applicants were disqualified if they "found some way to justify nondisclosure of the exculpatory evidence in the hypothetical question." Further, Marlinga avers that Kaiser was "designated as an Assistant United States Attorney," assisting with drug prosecutions. Finally, Marlinga avers that the instant case is the first and only one in which a defendant has complained about one of his assistants withholding *Brady* material.

Plaintiff's only counter-evidence on this issue is an affidavit from a former assistant Macomb County prosecutor, Steven Waclawski, who identifies himself as "an inmate at the Oaks Correctional Facility."[7]  He avers that while working in the Macomb County prosecutor's office from 1986 to 1990 he did not receive any "formal particularized training" on *Brady*.

On this record, no fact-finder could find that the county was deliberately indifferent to the possibility that citizens' rights would be violated by prosecutors who are ignorant about *Brady*.  The county's official policy was to turn over all exculpatory evidence, and at least a minimal amount of training (in the form of PAAM and PACC sessions and monthly videotapes, in addition to law school education) was provided.  Whatever training Waclawski did or did not receive from 1986 to 1990 has no bearing on the training assistant prosecutors received by the time of plaintiff's trial in 1998.  In short, there is no evidence that defendants were deliberately indifferent to citizens' constitutional rights by failing to provide the assistant prosecutors with training about *Brady*.

The third reason the failure-to-train claim fails is that plaintiff has produced no evidence to show that the county's allegedly inadequate training actually caused Kaiser to commit the *Brady* violation at issue in the present case.  Such a showing might be possible if plaintiff had been prosecuted by a novice prosecutor who was unfamiliar with *Brady*.  But Kaiser was no novice. When plaintiff was prosecuted, Kaiser was the senior trial attorney within the prosecutor's office. At that point, he had been working as a Macomb County assistant prosecutor for 13 years.  Before coming to Macomb County, Kaiser worked as an assistant prosecutor for Saginaw County.  As noted above, Kaiser trained new prosecutors in *Brady* and gave speeches on the subject.  On this record,

---

[7] According to the Michigan Department of Corrections' Offender Tracking Information System ("OTIS"), Waclawski is serving a 40-year sentence for nine different offenses, all having to do with computer crimes, rape and having sex with minors.

it is quite simply impossible to imagine that Kaiser violated plaintiff's *Brady* rights *because* he had not received more "training" on this subject. By virtue of his education and extensive trial experience, what more could Kaiser possibly have learned about *Brady* from additional county "training"? If Kaiser violated plaintiff's *Brady* rights by withholding the victim's husband's DNA test results, he did so because he chose to do so, not because the county failed to train him. In short, plaintiff has not shown that Kaiser would have acted any differently if he had received more or better or different training about *Brady*.

### *Conclusion*

For the reasons stated above, the court concludes that the Sterling Heights defendants are entitled to summary judgment because the voluntariness of plaintiff's confession was conclusively determined at the *Walker* hearing and because defendant Van Sice, assuming he failed to disclose the test results at issue, did not thereby violate plaintiff's *Brady* rights because the prosecutor possessed that evidence from another source. Further, the court concludes that defendant Kaiser is entitled to summary judgment because he is protected by absolute prosecutorial immunity. Finally, the court concludes that the Macomb County defendants are entitled to summary judgment because they are not required to train their assistant prosecutors about *Brady*, deliberate indifference is disproved by the fact that defendants did offer some training on the subject and, in any event, there is no evidence that a lack of training caused the prosecutor to violate plaintiff's *Brady* rights. Accordingly,

IT IS ORDERED that the Sterling Heights defendants' motion for summary judgment

is granted.

IT IS FURTHER ORDERED that defendant Kaiser's motion for summary judgment is granted.

IT IS FURTHER ORDERED that the Macomb County defendants' motion for summary judgment is granted.

S/Bernard A. Friedman
Bernard A. Friedman
Senior United States District Judge

Dated:  February 10, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 10, 2010, by electronic and/or ordinary mail.

S/Felicia Moses for Carol Mullins
Case Manager